# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DONALD A. BOOS, RAYMOND D.** | ) | |
| **JOHNSON, and WANDA N. MYERS,** | ) | |
| **on behalf of themselves and all other** | ) | |
| **persons similarly situated,** | ) | |
| | ) | **Civil Action No.  SA-07-CA-727-XR** |
| **Plaintiffs,** | ) | |
| | ) | |
| **VS.** | ) | |
| | ) | |
| **AT&T, INC, BELLSOUTH** | ) | |
| **CORPORATION, and the BELLSOUTH** | ) | |
| **TELEPHONE CONCESSION PLAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

On this date, the Court considered Defendants AT&T, Inc.'s and BellSouth Corporation's Motion for Summary Judgment (docket no. 79), Plaintiffs' Motion for Partial Summary Judgment (docket no. 81), and the responses and replies thereto.  The issue presented in both motions is whether a benefit known as "telephone concession" provided to BellSouth retirees living outside of Defendants' service area is an ERISA pension plan.  After careful consideration, the Court finds that Plaintiffs have failed to conclusively establish that the plan is an ERISA pension plan or to raise a material issue of fact with regard to the issue.  The Court will therefore deny Plaintiffs' Motion for Partial Summary Judgment and will grant Defendants' Motion for Summary Judgment.

## I. Factual and Procedural Background

### A. Telephone Concession

The summary-judgment evidence indicates that telephone concession – the practice of offering free or discounted telephone land-line services and toll reimbursements as a concession to telephone company employees and retirees – has been in use since at least the 1920s.  Def. ex. 1.  Documents from the 1950s indicate that telephone concession was provided by "Ma Bell" to its employees so that the company could reach supervisors and employees responsible for providing services, to build

morale, to allow employees to become familiar with the product in order to promote the product, and to obtain constructive criticism from employees about the product. Def. Ex. 2; Def. Ex. 3. Though there were variations among the local operating companies, Ma Bell generally offered Class A Concession, a 100% discount on charges for local exchange services and installation and a reasonable amount of toll service for management and supervisory employees, employees with thirty or more years of service and retirees on a pension, and corporate directors, and Class B Concession, a 50% discount on the charges for local exchange service and installation (with variations on toll reimbursement) for all other employees after six months of service. Def. Ex. 3 at ATTBS0000858. Ma Bell did not consider concession to be taxable income for its employees, and no amount of concession had been treated as compensation to the persons using the service. Def. Ex. 3 ATTBS000855-881.

At least by 1982, before the 1984 court-ordered divestiture, Ma Bell had also extended a reimbursement to certain retirees who resided outside Bell's service area and thus could not receive discounted service. Def. Ex. 4 at ATTBS0001211-16. Also by this time, Ma Bell viewed telephone concession as a benefit for its retirees. Def. Ex. 4 ATTBS0001211; Def. Ex. 4 ATTBS0001215 (processing of concession was handled by the "Employees Benefit Committee."). The summary-judgment evidence also indicates that Ma Bell and its employees viewed telephone concession as part of employees' compensation.

Court-ordered divestiture of Ma Bell occurred in 1984, and BellSouth Corporation was created as one of seven separate regional Bell operating companies, consisting of the Southern Bell and South Central Bell telephone operating companies. Docket no. 79 at 5. BellSouth implemented a concession program, and concession under BellSouth's plan was considered a benefit to employees and retirees. Def. Ex. 5 ATTBS0001169-79. The evidence shows that BellSouth has had a single policy document governing concession for in and out-of-region employees and retirees.

The 1984 concession plan sets forth the policy of BellSouth "to reimburse its employees, retirees and directors (active and retired) for all or a portion of the amounts charged for residence local exchange services and intra-LATA toll service"[1] and "to provide residence equipment to

---

[1] Intra-LATA toll service refers to long distance calls within the boundaries of a Local Access and Transport Area ("LATA"). Docket 79 at 6 n.4. The Modified Final Judgment issued during divestiture

employees at a discount." Def. Ex. 5 ATTBS0001169. The 1984 plan stated that "[a]ll non-management employees, entry level management employees and all retirees may be reimbursed for all or a portion of the amounts charged for basic local exchange service[2] provided for the benefit of the employee/retiree and his immediate family." Def. Ex. 5 ATTBS0001170. Entrance level managers and non-management employees with six months but less than thirty years of service were reimbursed for 40% of the amounts charged for all local services; employees with thirty or more years of service, all retirees, and all management employees were reimbursed for 100% of the amount charged for basic local service and 40% of the amounts charged for additional residence exchange services; certain higher level managers were reimbursed for 100% of amounts charged for all reasonable and adequate local service at one location; and active and retired officers and directors would be reimbursed for 100% of amounts charged for all reasonable local service at two locations. Def. Ex. 5 ATTBS0001170. With regard to concession reimbursements for persons residing out of BellSouth's service area, the Plan provided that "[a]ll active employees, retirees, and directors residing in the territory of a telephone company not a part of BellSouth Corporation . . . receive the same reimbursements as those described" for in-region employees, retirees, and directors. Def. Ex. 5 ATTBS0001170. Further, "[r]etirees [were] entitled to the same local service reimbursement as they received prior to retirement; however, in no case, anything less than 100% reimbursement for basic local service." *Id.* Employees and retirees were also eligible for various intra-LATA toll discounts and equipment discounts. Non-management employees with six months but less than thirty years of service received 20% of an amount up to $25.00 of eligible intra-LATA calls per month; non-management employees with thirty years of service and all non-management retirees were reimbursed 100% of an amount up to $25.00 of eligible intra-LATA calls per month; management employees and retirees were reimbursed for 100% of up to $50.00 of eligible intra-LATA calls per month; and active and retired officers and directors received 100% reimbursement on all reasonable,

_____

defined the LATA boundaries, and the regional bell operating companies were initially not permitted to offer inter-LATA service (long distance calls that crossed LATA boundaries or were interstate or international). *Id.*

[2] This included one main line, touch-tone, one additional listing, and Customer Access Line Charges. Def. Ex. 5 ATTBS0001170.

eligible intra-LATA calls. *Id.* All retirees could purchase any type of equipment "at the appropriate discount." *Id.* ATTBS0001171. To receive concession, employees submitted their telephone bills, and were reimbursed on their paycheck. Def. Ex. 5, ATTBS0001172. Retirees forwarded their bills to the Corporate Benefit Office serving them, where a "Sundry Expense Voucher" would be prepared for reimbursement. Def. Ex. 5 ATTBS0001172.

BellSouth issued a revised policy on telephone concession, effective April 1, 1985. Def. Ex. 7. The 1985 document states that it is the policy of BellSouth "to allow all the employees and retirees . . . an appropriate discount on the regular tariff rate for residence local exchange services provided by Southern Bell and South Central Bell, including related non-recurring charges and intra-LATA toll service." *Id.* ATTBS0001316. It provided that "[a]ll employees and retirees may be furnished local exchange service at discounted rates for the benefit of the employee/retiree and his immediate family for usual residential purposes at one location." Def. Ex. 7 ATTBS0001317. All employees with six months but less than thirty years of service received a 40% discount on local services; employees with thirty years of service and those retiring after April 1, 1985 received a 100% discount on "the central office line, one additional listing, touchtone, custom calling features and customer line charge" and a 40% discount on all additional concession-eligible services; post-divestiture retirees (retired between January 1, 1984 and April 1, 1985) received a 100% discount on "the central office line, one additional listing, touchtone, custom calling features and customer line charge"; and pre-divestiture retirees received the same concession for which they were eligible under the plan applicable at divestiture. *Id.* ATTBS0001317. All employees with thirty years of service and retirees could also receive 100% discount on non-recurring charges associated with concession-eligible services, while other employees received a 40% discount. *Id.*

Further, the 1985 plan provided that "[a]ll employees, and retirees may be furnished a toll service discount on intra-LATA calls for the benefit of the employee/retiree and his immediate family for the usual residential purposes at one location." Def. Ex. 7 ATTBS0001318. All employees with six months but less than thirty years of service received an amount up to $25.00 of eligible intra-LATA calls each month; all employees with thirty years of service and all retirees received up to $50.00 of eligible intra-LATA calls each month; and pre-divestiture retirees received a 100% discount on all reasonable, eligible intra-LATA toll service and a 100% discount on all reasonable inter-LATA

toll service provided by AT&T.[3]  Def. Ex. 7 ATTBS0001319.  The 1985 plan document applied to all retirees, and did not expressly distinguish between in-region and out-of-region, or specify how the discount was to be provided.

A February 1986 document entitled "Employee and Retiree Telephone Discount Policy" stated that it was the policy of BellSouth "to allow its employees and retirees a discount on amounts billed for residence local exchange service, related non-recurring charges and intra-LATA toll service." Def. Ex. 8 ATTBS0001130.  It stated that "[a]ll employees with at least six months of service and retirees may be furnished local exchange service at discounted rates for the benefit of the employee/retiree and his/her immediate family for usual residential purposes." *Id.* ATTBS0001131. Employees with six months but less than thirty years of service received a 40% discount for all concession-eligible services, and employees with thirty or more years of service and all employees retiring on service or disability pension on or after April 1, 1985 would receive a 100% discount on one central office line, customer access line charge, custom calling features, touch-tone, trouble isolation/inside wiring maintenance, and one additional listing, and a 40% discount on all additional concession-eligible services. *Id.*   Further, employees with six months but less than thirty years of service could receive a toll allowance of $25 per month for eligible intra-LATA calls; employees with thirty years of service could receive a toll allowance of $50 per month for eligible intra-LATA calls; and all retirees could receive a 100% discount on an amount up to $50 on eligible intra-LATA calls. *Id.* ATTBS0001133.  The plan provided for reimbursement by voucher for active employees residing out of region and allowed for a retiree residing in the territory of another telephone company to either submit bills for payment by BellSouth to the serving company for the service or to pay the bill himself and be reimbursed by BellSouth.  Def. Ex. 8 ATTBS0001137.  When an employee attained thirty years of service, he received a letter notifying him that he would be eligible to receive 100% discount on basic service (but that only one BellSouth employee/retiree per household could receive the discount), a 40% discount on other services, and up to $50.00 per month of intra-LATA calls.  Def. Ex. 8 ATTBS0001140.  Retiring employees (both in and out of region) received a similar letter, notifying them that they would be eligible "following your retirement" for the applicable discounts.

_____

[3] After divestiture, BellSouth and AT&T entered into an agreement to continue concession for inter-LATA toll service for pre-divestiture retirees.  Def. Ex. 11.

5

Def. Ex. 8 ATTBS0001144. Letters to retirees who would reside in region informed them that they would be billed at the full rate, and would need to sign the bill as correct and forward it for payment to the BellSouth Services Benefit Office. *Id.* ATTBS0001142. Letters to retirees residing out of region also provided instructions on how to handle the bill "in order to take advantage of telephone service at a discount." *Id.* ATTBS0001144. The letters to retiring employees concluded, "I assure you that your Company is genuinely glad that it is in position to continue to provide you with this service following your retirement." *Id.* ATTBS0001145.

In March 1996, BellSouth implemented a new Concession policy that expanded the services that qualified for concession to include "all current and future residential BST-provided services" and changed "the way that concession is applied." Def. Ex. 9 ATTBS0001084. The plan stated that "[i]t is BST's policy to allow all regular full-time and regular part-time active employees and retirees an appropriate discount on the regular tariff rate for BST-provided services" and that "[d]iscounts are provided for the benefit of the employee or retiree and their immediate families for usual residential purposes and only at one location and only where the telephone is located in the employee's or retiree's primary residence." Def. Ex. 9 ATTBS0001087 (emphasis in original).

Under the 1996 policy, employees with more than six months but less than thirty years of service received a 40% discount on local service rates and the customer access charge, a 40% discount on optional services and package plans per month, a 40% discount on non-recurring charges such as installation or a change or move of service, and up to $25 for "usage charges" (which included BST-provided local toll, per service activation charges, etc.). *Id.* ATTBS0001085. Employees with thirty years of service attained and those who retired on or after April 1, 1996 received a 100% discount on local service, a 40% discount on optional services, a 100% discount on non-recurring charges associated with local service and 40% on all other services, and up to $50 on usage charges. *Id.* Employees with thirty years of service attained prior to April 1, 1996 received 100% discount on local service, 100% on certain optional services and 40% on others, a 100% discount on non-recurring charges for services provided at 100% concession and a 40% discount on non-recurring charges for services provided at 40% concession, and up to $50 for usage charges. *Id.* Employees hired before April 1, 1996 and residing in territories served by other telephone companies remained eligible for concession with the same "basic 40-percent/100-percent and $25/$50

parameters based on eligibility"; they received concession benefits by paying the company furnishing service and preparing a voucher for reimbursement. Def. Ex. 9 ATTBA0001090.[4] However, employees hired on or after April 1, 1996 and who lived out of region would no longer be reimbursed for concession. Current employees living out of region would continue to be reimbursed. Def. Ex. 9 ATTBS0001091.

The letter to BellSouth supervisors regarding the 1996 Concession policy stated that "[t]elephone concession is a part of your total compensation from BellSouth" and noted that, as employees, they were "valuable marketer[s] of our services." Def. Ex. 9 ATTBS0001084. The plan document also contained a provision on "Policy Continuation," which stated that "[t]he company currently intends to continue telephone concession for active employees and retirees under the terms of the concession policy, but reserves the right to amend or terminate the policy at any time, subject to any applicable collective bargaining agreements." Def. Ex. 9 ATTBS0001091.

Administration of out-of-region retiree concession was handled internally until 1997, when BellSouth outsourced this function to Mercer (at the same time it outsourced administration of its pension plans to Mercer). Def. Ex. 12 Peavler Depo. at 116; Pl. Ex. M Hart Depo. at 59. Mercer was given eligibility criteria that allowed it to determine who was eligible to receive telephone concession as a retiree. Pl. Ex, N Kanoon Depo at 67, 71. Acordia/Wells Fargo replaced Mercer as administrator in February 2003.[5] Thus, since at least 1997, out-of-region retiree concession has been administered separately from other aspects of concession.

A new policy document for the "BellSouth Employee Telephone Concession Program" was issued effective September 1, 2003. Def. Ex. 10.[6] It provided that "BellSouth allows active employees and retirees a concession on company-provided telecommunications services, subject to

---

[4] Further, the discount was continued at the employee's or retiree's residence for three months after the person's death if surviving relatives remained at the residence. Def. Ex. 9 ATTBS0001091.

[5] Acordia did not make the initial determination of whether someone was eligible to receive telephone concession as an out-of-region retiree, but received a fee from the pension vendor that would indicate the individual's status. Pl. Ex. Q McLaughlin Depo at 59. Hewitt, the pension administrator, made the determination of whether someone was pension-eligible. *Id.* at 102.

[6] This same policy was re-issued on August 1, 2007, without any material changes. *See* Pl. Ex. Q McLaughlin Depo. at 75; Pl. Ex. Q-1.

applicable state tariffs and FCC regulations." Def. Ex. 10 ATTBS0001037. It stated that "[a] telephone concession is provided for the benefit of the employee or the retiree at his or her primary residence, for usual residential purposes." *Id.* Under the 2003 policy, the "basic 40-percent/100-percent local service and $25/$50 parameters based on eligibility [were] the same" as the 1996 policy. Def. Ex. 10 ATTBS0001038. As before, for employees and retirees living outside BellSouth territory, only those hired before April 1, 1996 were eligible for concession. Employees received reimbursement through the expense reimbursement system, and retirees would "submit amounts for reimbursement to the address provided in their retirement package." Def. Ex. 10 ATTBS0001039; Pl. Ex. Q McLaughlin Depo at 56 (testifying that between 2002 and 2006, out-of-region active employees used an expense voucher system for concession reimbursement).

In 2006, BellSouth merged with AT&T. Following the merger, BellSouth employees and retirees have continued to receive concession pursuant to BellSouth's pre-merger concession policy. As before, concession or reimbursement is provided only if residential telephone service is purchased and is only available once at a particular address, even if two or more eligible employees or retirees reside there. At all times, concession reimbursements and related expenses have been paid from Defendants' general assets. Ex. 18, Lacy Depo. at 80-81.

**B. Plaintiffs' Lawsuit**

Plaintiffs, who are retired employees of BellSouth, filed this action on September 7, 2007 on behalf of a class of similarly situated retirees.[7] Docket no. 1. They assert enforcement claims under

---

[7] Plaintiff Donald O. Boos is a retired employee of South Central Bell, which subsequently became part of BellSouth Telecommunications, Inc. and Bell South. Complaint ¶ 9. He retired with a service pension in 1985 and moved outside the BellSouth Service Area. *Id.* "At all times since his retirement, Plaintiff Boos has received a Retiree Telephone Concession in the form of one hundred percent (100%) reimbursement on local telephone service, fifty dollars ($50) per month allowance for IntraLATA (local long distance) calls and a forty percent (40%) discount on excess services." *Id.* Plaintiff Raymond D. Johnson is a retired employee of Southern Bell (which subsequently became part of BellSouth Telecommunications, Inc. and BellSouth). *Id.* ¶ 10. He retired with a service pension in 1987 and moved out of Defendants' service area in 1989. *Id.* Johnson has received a retiree telephone concession "in the form of one hundred percent (100%) reimbursement on local services ... and forty percent (40%) on any other optional services." *Id.* Plaintiff Wanda N. Myers is a retired employee of South Central Bell and BellSouth Telecommunications. *Id.* at ¶ 11. She retired with a service pension in 1996 and has resided outside the Defendants' service area at all times since her retirement. *Id.* She has received a retiree telephone concession "in the form of one hundred percent (100%) reimbursement on local service, fifty dollars ($50) per month allowance for IntraLATA (local long distance) calls and a forty percent (40%) discount on optional services." *Id.*

ERISA § 502(a)(1)(B), (a)(2), (a)(3), and (c)(3) "concerning the establishment and/or maintenance by Defendants BellSouth and AT&T, Inc. (formerly known as SBC Communications, Inc.) of a benefit known as Telephone Concession for certain retirees who lived outside the BellSouth Local Service Area ('OOR Retirees') and who retired with a Service or Disability Pension ('Out-of-Service-Area Telephone Concession' or 'OOR Concession')." *Id.* ¶ 1. They allege that "[t]he fundamental premise of this lawsuit is that by informing employees that they would receive an OOR Concession when they retired with a Service or Disability Pension, and by providing Telephone Concession to retirees who lived outside the BellSouth Service Area (and received telephone service from an Independent Telephone Company), Defendant BellSouth established and maintained a 'defined benefit pension plan' within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35) ('the BellSouth Telephone Concession Plan')." *Id.* ¶ 2. Plaintiffs allege that, when "AT&T purchased Defendant BellSouth, as of the closing date of the Merger, December 29, 2006, Defendant AT&T then continued and maintained the BellSouth Telephone Concession Plan." *Id.* Plaintiffs allege that Defendants' conduct before and after the merger violated the provisions of ERISA governing defined benefit pension plans. *Id.* ¶ 3.

Plaintiffs' Complaint seeks (1) "a determination that the BellSouth Telephone Concession provided to OOR Retirees is a pension plan under ERISA §3(2), 29 U.S.C. ¶ 1002(2), and a defined benefit plan under § 3(35), 29 U.S.C. ¶ 1002(35)"; (2) reformation of the plan and its governing policies to comply with ERISA; (3) an order requiring Defendants to fund the plan, as reformed, in accordance with ERISA's funding provisions, and appointment of an independent fiduciary to administer the plan and manage its assets including its right to receive contributions from Defendants in compliance with ERISA; and (4) a declaration determining and requiring the plan, as reformed, to pay benefits to Plaintiffs and other class members consistent with its terms.

Defendants filed their Amended Answer on January 6, 2009. Docket no. 54. Defendants deny that telephone concession provided to OOR retirees is an ERISA benefit plan.[8]

---

[8] Defendants also assert the affirmative defense of impossibility. Docket no. 54 at 28 ("The very nature of the telephone concession benefit offered to these OOR retirees is so unlike a defined benefit plan accrued benefit that it cannot be one, and the benefit would need to be unrecognizably transformed from the current offering in order to fit within ERISA's rules for defined benefit pension plans."). Though they initially raised this defense with regard to the issue of whether there is an ERISA plan, Defendants have now conceded

## C. Procedural Posture

This case was previously pending before the Honorable Judge William Wayne Justice.  On August 8, 2008, Judge Justice granted Plaintiffs' motion for class certification and certified two classes, a Plan Claims Class and a Benefits Claims Class.  Docket no. 39.  The scheduling order bifurcated the case into two phases – the current phase, Phase I, will determine whether the telephone concession is an ERISA pension plan.  Phase II would resolve the claims asserted for failure to comply with ERISA related to the establishment, maintenance, management, and administration of the plan (the "Plan Claims") and the § 502(a)(1)(B) claim for a declaration of class members' right to continue to receive benefits (the "Benefit Claims").

Both sides have filed motions for summary judgment on the Phase I issue of whether OOR Retiree Concession in an ERISA defined benefit pension plan.

## II. ERISA

ERISA provides that,

[e]xcept as provided in subparagraph (B), the terms 'employee pension benefit plan' and 'pension plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program–

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution is made to an employee who has attained age 62 and who is not separated from employment at the time of such distribution.

29 U.S.C. § 1002(2)(A).  Pension benefit plans are divided into two subcategories: defined contribution plans and defined benefit plans.  Plaintiffs contend that the telephone concession is a

that the issue should be resolved as part of Phase II.

defined benefit plan, which is generally defined as a pension plan other than an individual account plan. 29 U.S.C. § 1002(35).

The regulations attempt to "clarify the limits" of the terms employee pension benefit plan and pension plan "by identifying certain specific plans, funds and programs which do not constitute employee pension benefit plans" for purposes of Title I. 29 C.F.R. § 2510.3-2(a). Thus, section 2510.3-2 exempts certain severance pay plans, bonus programs for work performed ("unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees"), certain individual retirement accounts, annuities, or bonds described in section 408 or 409 of the Code, certain gratuitous payments to pre-Act retirees; and certain tax-sheltered annuities. *Id.* It also provides that "[g]enerally, an arrangement by which a payment is made by an employer to supplement retirement income is a pension plan," but certain supplemental payments are treated as being made under a welfare plan if certain conditions are met. *Id.* § 2510.3-2(g).

In addition, in § 2510.3-1, the regulations further set forth certain practices that do not constitute welfare plans under section 3(1) of the Act and that also "do not constitute employee pension benefit plans within the meaning of section 3(2) of the Act." These include: (1) payroll practices[9]; (2) certain on-premise facilities, including for recreation, dining, and first-aid (but not day care centers); (3) holiday gifts such as turkeys and hams; (4) sales to employees "whether or not at prevailing market prices, of articles or commodities of the kind which the employer offers for sale in the regular course of business"; (5) hiring halls; (6) remembrance funds; (7) strike funds; (8) industry advancement programs; (9) certain group or group-type insurance programs; and (10) unfunded scholarship programs. The regulations expressly note that some of these were "inserted in response

_____

[9] This includes "[p]ayment by an employer of compensation on account of work performed by an employee"; "[p]ayment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment)"; "[p]ayment of compensation, out of the employer's general assets, on account of periods of time during which the employee, although physically and mentally able to perform his or her duties and not absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment) performs no duties; for example" payment while employee is on vacation, active military duty, jury duty, training, or on sabbatical leave.

to questions received by the Department of Labor and, in the Department's judgment, do not represent borderline cases under the definition in section 3(1) of the Act" such that "this section should not be read as implicitly indicating the Department's views on the possible scope of section 3(1)."

### III. Analysis

Courts in the Fifth Circuit utilize the three-factor test set out in *Meredith v. Time Insurance*, 980 F.2d 352, 355 (5th Cir. 1993), for determining whether an employee benefit arrangement is an ERISA plan. We consider whether: (1) the plan exists[10]; (2) the plan falls within the safe-harbor provision established by the Department of Labor; and (3) the employer established or maintained the plan with the intent to benefit employees. *Peace v. Am. Gen. Life Ins.*, 462 F.3d 437, 439 (5th Cir. 2006).[11] "If any part of the inquiry is answered in the negative, the submission is not an ERISA plan." *Id.* While the "existence vel non of a plan is a question of fact," *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 235 (5th Cir. 1995),[12] when the material facts are undisputed, the issue becomes one of law.

Defendants "do not challenge that Concession is provided through a plan, does not fall within the Department of Labor's ('DOL') safe harbor regulations, and was maintained by Defendants." Docket no. 85 at 2 n.2. The fact that a plan exists, however, does not establish that the plan is an ERISA plan. Plaintiffs move for summary judgment only on the issue of whether the plan is a pension plan because it provides retirement income. Thus, the decisive issue for Plaintiff's motion is whether the Defendants established or maintained a plan that was intended to and does provide retirement

---

[10] As the statute itself makes clear, the plan need not be formalized, and a plaintiff can prevail if the existence of a plan can be inferred from the "surrounding circumstances." 29 U.S.C. § 1002(2)(A). Thus, to determine whether a plan exists, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Meredith*, 980 F.2d at 355.

[11] This third step of the analysis involves "two elements--(1) whether the employer established or maintained the plan, and (2) whether the employer intended to provide benefits to its employees." *Shearer v. Southwest Serv. Life Ins. Co.*, 516 F.3d 276, 279 (5th Cir. 2008).

[12] As noted by the Fifth Circuit, "[n]othing requires that this determination be made by a jury; indeed, ERISA claims do not entitle a plaintiff to a jury." *Graham v. Metropolitan Life Ins. Co.*, 2009 WL 3403187 (5th Cir. 2009) (citing *Borst v. Chevron Corp.*, 36 F.3d 1308, 1324 (5th Cir. 1994)).

income. Defendants move for summary judgment with regard to both aspects of ERISA pension plans, arguing that the OOR retiree benefit neither provides retirement income nor results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. Thus, with regard to Defendants' motion, Plaintiff must either establish a fact issue with regard to whether OOR retiree concession provides retirement income or establish a fact issue with regard to whether it results in a deferral of income under ERISA's definition of a pension plan.

## A. When does a plan "provide retirement income"?

ERISA provides that a pension plan is "any plan, fund, or program . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program– (i) provides retirement income to employees." ERISA does not define the term "provides retirement income," and neither do the regulations issued by the Department of Labor. The Fifth Circuit has twice considered what the phrase "provides retirement income" means.

In *Murphy v. Inexco Oil*, 611 F.2d 570 (5th Cir. 1980), the Fifth Circuit held that ERISA's definition of a pension plan is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach" and that "[t]he words 'provides retirement income' patently refer only to plans *designed for the purpose of paying retirement income* whether as a result of their express terms or surrounding circumstances." *Id.* at 575 (emphasis added.) Murphy was formerly president of Inexco, and while he was a corporate officer, Inexco gave bonuses to selected employees "by assigning a specific royalty interest in a drilling prospect it planned to develop to Westland Royalty Company." *Id.* at 572. Westland would administer that interest for the benefit of the designated employee in accordance with a plan called the Westland Royalty Participation Agreement, under which each employee was given "participation units" defined as the right to receive a fractional portion of any proceeds that might thereafter accrue from the designated project, not from Westland's revenue as a whole. *Id.* Royalty payments were made to Westland from production proceeds, not from the employer's funds, and Westland in turn paid each participant his share of the oil and gas proceeds annually. *Id.* at 572-73. Assignment of an interest in a prospect was discretionary, based on management's assessment of an employee's contribution to the company, with consideration being given to length of service and job classification. *Id.* at 573. At the end of a person's employment, by retirement or otherwise, Inexco no longer assigned new participation units

to the person, but the person continued to own those participation units representing interests that had already been assigned. Under the evidence presented, contributions to the plan were bonuses, were discretionary, were awarded in addition to regular compensation, and payments started in the year in which a given prospect began to produce, a time when the employee ordinarily was in active service with the company, and continued so long as there was production. *Id.* at 574. Thus, "while the primary thrust of the plan is to reward employees during their active years, payments to some employees or their heirs are likely to continue after the employee has retired or ceased work because of death or disability." *Id.*

In rejecting Murphy's claim that the plan was an ERISA pension plan, the Court held that, "[u]nder the statutory definition, . . . the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." *Id.* at 575. Though acknowledging that ERISA is applicable to bonus plans whose payments "are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement benefits" the Court held that "[t]he Westland Agreement provides for benefits to be paid immediately to employees, not for their deferment in any fashion, systematic or otherwise; it was evidently designed to provide current rather than retirement income to Inexco's employees." *Id.* at 575-76. It further reasoned that "Inexco rewarded its employees for their work with a bonus consisting of a royalty right. Some of the proceeds of this right might be paid to an employee after he had retired or otherwise left Inexco, or even to his heirs after his death, but this arose out of the inherent characteristics of the property used to pay the bonus. Save for its non-assignability, the full economic benefit of the bonus accrued from the time production began. The import of the regulations, therefore, is to exempt the Westland Agreement from ERISA coverage."

More recently, in *Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339 (5th Cir. 2003), the Court held that a grocery voucher plan was an ERISA pension plan. Schwegmann Giant Super Markets ("SGSM") operated a chain of grocery stores in New Orleans. Mr. Schwegmann "conceived a plan for SGSM to give its retirees groceries and other goods free of charge. Mr. Schwegmann then worked with Mr. Sam Levy, president of SGSM, Inc., and Mr. Joe Warnke, SGSM director of human resources, to create a voucher program for long-term SGSM employees at their retirement. In 1985, SGSM implemented this grocery voucher plan (the 'Voucher Plan')

designed to supply SGSM retirees with a portion of their monthly food needs. Under this plan, SGSM issued vouchers to retirees, and these vouchers could then be used in lieu of cash to purchase goods in SGSM stores." *Id.* at 342. To qualify for the vouchers, an employee must have completed twenty years of service with SGSM, have reached the age of sixty, and have been employed in a supervisory position for at least one year at the time of retirement. Each month, SGSM sent qualifying employees a set of four vouchers worth a total of $216. The vouchers were valid for a period of thirty days, redeemable only at SGSM stores and could not be transferred. SGSM had no written procedures for administering the Voucher Plan, but it was run in a systematic manner. The Plan was funded out of the general revenue, and each year SGSM deducted the total face value of the vouchers as a business expense on its tax returns under the category of "retirement plans, etc." SGSM also issued a form 1099-R to every retiree receiving vouchers. Mr. Schwegmann considered the vouchers a gratuity subject to termination at will. After the Voucher Plan was terminated after the sale of the business, the plaintiffs sued, claiming that they were vested in an ERISA pension benefit plan.

The Court noted that "the primary issue" was "whether the vouchers issued pursuant to SGSM's Voucher Plan provided the Plaintiffs with 'retirement income.'" *Id.* at 344. The Court held that ERISA and its regulations do not affirmatively require that a pension benefit be paid in cash and that the district court properly relied on the definition of income used for purposes of determining taxable income under the Internal Revenue Code ("IRC"), "given the close connection between ERISA and the IRC." *Id.* at 345. Noting that the Court "has interpreted the term 'income' broadly under the IRC to include anything that can be valued in terms of currency" and "[b]ased on SGSM's deduction of the expense on its tax returns and issuing 1099-R's," the Court held that "the district court was entitled to infer that SGSM considered the vouchers income under the IRC." It further noted that "[t]he cash value of the vouchers is readily ascertainable from the face of the vouchers, and the district court correctly concluded that the vouchers constituted income and the Voucher Plan is governed by ERISA." *Id.* Further, "[e]ven under the plain or ordinary meaning of income, the conclusion would be same because income is a 'gain or recurrent benefit usually measured in money' and the vouchers provided a gain or benefit to SGSM employees and could readily be measured in money."

The Court further rejected SGSM's argument that the vouchers were a "sale to an employee" exempted from ERISA under 29 C.F.R. § 2510.3-1(e) because the voucher transactions bore "none of the hallmarks of a sale." SGSM received no money or anything else of value in exchange for the vouchers or groceries, and the transactions were much closer to gifts by SGSM, comporting with the gratuitous intent expressed by Mr. Schwegmann. The Court held that, because the plan did not just offer goods for sale to employees but also provided them with a means to pay for the goods, it was not a sale to an employee.

Turning to SGSM's argument that "no in-kind benefit can ever be covered by ERISA" based on district court cases involving airline programs allowing employees and retirees to fly free or at reduced rates, the Court noted that, "[s]ignificantly, these cases involve travel benefits in what would otherwise be an empty seat." *Id.* at 347. The Fifth Circuit noted that "[e]ach court summarily concluded that the travel benefits were not ERISA pension benefit plans because they did not provide income to the retiree," and further stated that, "[h]ad the courts looked to the IRC to determine whether the travel benefits were income, they would have answered this question in the negative because these benefits provided a 'no-additional-cost-service." *See* 26 U.S.C. § 132(a)(1) (exempting no-additional-cost-service fringe benefits from gross income). Because the grocery vouchers provided income to retirees, the Court held that the voucher plan was an ERISA pension plan.

These two cases provide distinct factual scenarios. In *Murphy*, a bonus was paid to a current employee but, because of the nature of the interest given as a bonus (royalty interest), it had the incidental effect of providing some taxable income in retirement. The Court found it was not an ERISA pension plan because it was not designed to provide retirement income. In *Schwegmann*, a voucher plan that was intended to and did provide income in retirement only was an ERISA pension plan. Looking at a portion of the BellSouth telephone concession plan in isolation – out-of-region reimbursement to retirees – Plaintiffs argue that cash reimbursements to retirees are designed to and do provide retirement income. Plaintiffs argue that reimbursement to retirees who live outside of AT&T's service area qualifies as an ERISA pension plan because the plan may be treated as an ERISA pension plan "to the extent that" it "provides retirement income." In contrast, Defendants argue that the plan must be viewed as a whole and is more like *Murphy* – a plan to provide current non-taxable compensation to employees and certain retirees, which incidentally provides, as a matter

of parity, income to a class of retirees who live outside of AT&T's service area. Defendants argue that the benefit of telephone concession is more like a welfare benefit, which does not vest and can be discontinued by the employer at any time, than a pension benefit, which receives ERISA's highest forms of protection, including vesting, insurance, and survivor benefits.

The Court finds this to be a very close case. The benefit situation presented here is unique. Only two cases have addressed a similar benefit plan – *Stoffels v. SBC Communication*, 555 F. Supp. 2d 745 (W.D. Tex. 2008), in which Judge Justice found that an ERISA pension plan existed for out-of-region retirees, and *Rathbun v. Qwest Communications Int'l, Inc.*, 458 F. Supp. 2d 1238, 1248 (D. Colo. 2006), in which Judge Babcock found that similar facts did not establish an ERISA pension plan. Both sides have briefed the issues extremely well, and the Court commends them for presenting such thoughtful, well-supported briefs.[13]

## B. How to view the plan for purposes of determining whether it is an ERISA pension plan

Plaintiffs assert that the Court may and should view the OOR Retiree Concession as a separate plan for purposes of determining whether it is an ERISA pension plan. Judge Justice agreed with this position in *Stoffels* with regard to SBC's concession, relying primarily on the fact that the OOR Retiree Concession was separately administered. On summary judgment, Judge Justice found that Plaintiffs had created a fact issue with regard to the issue of how to view the plan because AT&T's interrogatory responses identified "up to 51 separate concessions, SBC/AT&T's Director of Human Resources testified that she viewed the Concession for OOR Retirees as separate from the Concession to In-Region Retirees, and by 2000 the OOR Retiree Concession had a distinct infrastructure from other segments of the larger plan." *Stoffels*, 526 F. Supp. 2d at 650. In concluding that the fact that part of concession was provided to current employees did not render the retiree benefits beyond the scope of ERISA, Judge Justice found that "Plaintiffs have presented evidence that creates a genuine issue in regard to the distinction between the larger Concession and

---

[13] Unfortunately, the Court feels that it must take a moment to express some disappointment with some of the attacks made throughout Defendants' briefing. Defendants' briefing accuses Plaintiffs of "unabashed gamesmanship," docket no. 85 at 7, and artful pleading docket no. 79 at 17. As noted by Plaintiffs, gamesmanship suggests unsportsmanlike or improper conduct, none of which this Court has perceived in Plaintiffs' presentation of their case. Rather, Plaintiffs have presented a cogent argument, well supported by facts and legal authority, in an area repeatedly referred to as complex and difficult. The fact that Defendants disagree with Plaintiffs' position, however strongly, does not justify such attacks.

the OOR Retiree Concession – most convincingly the OOR Retiree Concession's separate administration– and the defendant has provided no legitimate reason to alter the Court's earlier finding." *Id.* at 651. After trial before an advisory jury, Judge Justice found the OOR Retiree Concession to be a separate plan for ERISA purposes.

In this case, Defendants assert that we should look at the entire plan, which is designed to provide current compensation to employees, and that it is inappropriate to isolate the OOR Retiree Concession. Defendants argue that an ERISA pension plan is only one that provides "retirement income," not any plan that provides retirement benefits. Defendants assert that Plaintiffs are trying to carve out a small portion of the larger concession plan, and that the OOR concession "lacks the characteristics of a pension plan" because the benefits commence after six months' employment, not at retirement, only reimburse certain expenses incurred, are wholly dependent on where the employee or retiree resides and takes telephone service, and cash reimbursements are made only if employees and retirees file timely reimbursement requests substantiating their expenditures. Defendants argue that the OOR Concession is more like a welfare plan, but is not in fact a welfare plan because it is not on the list of the specific benefits Congress chose to enumerate in ERISA. Defendants argue that the fact that it is not a welfare plan does not mean that it should be a pension plan, subject to the much more stringent requirements and protections Congress enacted to protect pension plans, but instead means that Congress simply did not intend to regulate these types of fringe benefits under ERISA at all, leaving them to be governed by contract principles under state law. Defendants contend that it makes no sense to carve out the benefits given to out-of-region retirees, which were provided as a matter of parity to the benefits given to in-region retirees and employees, and give them the highest degree of protection ERISA offers, while leaving the in-region form outside the scope of ERISA.

Under *Murphy* and *Schwegmann*, a plan is an ERISA pension plan if it was designed for the purpose of providing retirement income and actually does provide retirement income. To make this determination in this case, the Court finds that it must look at how the plan was designed to treat and how it does treat *all retirees*, not just out-of-region retirees, as Plaintiffs assert. The Court finds this to be required by the undisputed facts that all retirees were promised the same benefit – discounted or free telephone services – and that retirees can move between OOR and in-region concession. The groups defined as in-region and out-of-region retirees are not immutable, discrete groups. Rather,

retirees could, at any point, move between the two groups simply by moving in or out of Defendants' service area. Or, Defendants' service area could expand or contract and result in a change in a retiree's status as in-region or out-of-region.[14]

Because of these undisputed facts, the Court disagrees with Plaintiffs that there are different types of benefits involved for in-region retirees and OOR retirees. Rather, the benefit provided to both in-region and out-of-region retirees is the same – "telephone concessions," or discounted and free telephone services.[15] Eligibility for discounted and free telephone services concession is

_____

[14] For example, Defendants' interrogatory answers state that, after AT&T's acquisition of BellSouth, 541 of the BellSouth OOR Retirees were within the AT&T local service area. Def. Ex. 6 at 1©). Further, the Court does not find the fact that employees often did not move between in-region and out-of-region to change this conclusion or raise a material issue of fact, nor does the fact that, for valuation of liability purposes, JP Morgan made the assumption that OOR retirees would remain OOR until death (Pl. Ex. S at 9).

[15] The various versions of BellSouth's telephone concession plan in effect since divestiture make clear that the benefit is the same for all retirees, regardless of whether they are in-region or out-of-region. As noted above, the 1984 concession plan set forth the policy of BellSouth "to reimburse its employees, retirees and directors (active and retired) for all or a portion of the amounts charged for residence local exchange services and intra-LATA toll service." The 1985 document states that it is the policy of BellSouth "to allow all the employees and retirees . . . an appropriate discount on the regular tariff rate for residence local exchange services provided by Southern Bell and South Central Bell, including related non-recurring charges and intra-LATA toll service." A February 1986 document entitled "Employee and Retiree Telephone Discount Policy" stated that it was the policy of BellSouth "to allow its employees and retirees a discount on amounts billed for residence local exchange service, related non-recurring charges and intra-LATA toll service." The March 1996 plan stated that "[i]t is BST's policy to allow all regular full-time and regular part-time active employees and retirees an appropriate discount on the regular tariff rate for BST-provided services." The 2003 policy document states that "BellSouth allows active employees and retirees a concession on company-provided telecommunications services, subject to applicable state tariffs and FCC regulations." These documents also indicate that the primary purpose of concession was to provide a discount on BellSouth-provided services.

Defendants' 30(b)(6) representative testified that telephone concession involves both the discount to those residing within the service area and reimbursement to those residing outside the service area. Pl. Ex. Q McLaughlin Depo. at 24. He testified that the benefit received by OOR retirees is telephone concession in the form of reimbursement of incurred expenses. *Id.* at 165; *see also* Pl. Ex. ZZZ ("Retired employees that live in independent company territory are billed at the full tariff rate but are given the same concession that they would receive if their service was provided by the telephone company that they are retired from.").

Further, the "retirement kit" that Plaintiffs rely on shows that in-region and out-of-region retirees were promised the same benefit – appropriate discounts on local exchange service and toll services. It states that it includes information about "post-retirement BellSouth benefits, including health care, life insurance and telephone concessions." Pl. Ex. N-3. It states that "[r]etired employees continue to be eligible for appropriate discounts on residence local exchange service (including related non-recurring charges) and toll services." *Id.* It then provides under the heading "Service Provided by BellSouth" that "[a]ppropriate discounts will automatically be applied to your monthly bill." *Id.* Under the heading "Service Provided by Another

determined for all retirees based on the same factors – generally, retiring with a service or disability pension.[16]  It is only the *method* of receiving the benefit that differs depending on whether the retiree is living in or out of Defendants' service area.  When Plaintiff  Donald Boos was asked "Had you stayed in the area [served by South Central Bell], would you have essentially received *the same benefit* in the form of a discount rather than getting a cash payment?", he replied "Yes, I believe so."  Boos Depo at 59 (emphasis added).  But the fact that the method of receiving the benefit may be different for in-region and out-of-region retirees might differ does not result in a finding that there are two different benefits.  Even in-region concession has been administered by different methods, including reimbursement.  Thus, throughout the history of BellSouth's telephone concession, the telephone concession benefit has been provided by various methods involving reimbursement and discounts, but the benefit – discounted or free telephone services – has remained the same for in-region and out-of-region retirees.  Therefore, in analyzing whether telephone concession was designed with the purpose of providing retirement income and actually does provide retirement income, the Court will consider the plan and the surrounding circumstances with regard to all retirees, regardless of the fact that the method of distributing the benefit and, concomitantly, the method of administering the benefit and accounting for the benefit, is different for in-region and out-of-region retirees.[17]

---

Company," it states "[i]f another company provides your telephone service or if you have exceptions to your tolls, you must submit your telephone bill to the BellSouth Pension Administrator to receive your concession."  *Id.*  Thus, all retirees were informed that they would receive the same benefit –"appropriate discounts on residence local exchange service and toll services."

Plaintiffs also point to such documents as Mercer's "BST Telephone Concessions User Guide," stating that it describes OOR Retiree Concession as offering "retirees concessions (or rebates) on specific services on their monthly phone bills."  Pl. Ex. N-1.  Notably, this description of the benefit also describes in-region retiree concession.

[16] *See, e.g.*, Pl. Ex. Q McLaughlin Depo at 49 ("The eligibility would be based on the policy, okay, which is if someone is either service pension-eligible or disability pension-eligible, and that applied whether they were in-region or out-of-region.");  Pl. Ex. U Peavler Depo at 123 (testifying that one needed to be a retiree, meaning someone who has service or disability pension eligible, to receive telephone concession in retirement).

[17] Plaintiffs argue that a material fact issue exists regarding whether OOR Retiree Concession was a separate plan because it is separately administered.  However, as noted, the fact that one form of the telephone concession benefit is separately administered would not result in a separate plan under the facts presented, and

## C. Tax Treatment of the Benefit

*Schwegmann* directs that we consider the benefit's status as taxable income in determining whether the benefit at issue provides retirement income. *Schwegmann*, 332 F.3d at 345 (approving district court's use of definition of "income" used for purposes of determining taxable income under the IRC). Under *Schwegmann*, any benefit that does not qualify as gross (*i.e.*, taxable) income would not provide retirement income for purposes of ERISA. The Court must therefore consider whether the benefits at issue here – discounted and free telephone services provided to retirees – are taxable income under the IRC.

Generally, fringe benefits are included in gross income unless expressly excluded. Treas. Reg. § 1.61-21(a) ("Section 61(a)(1) provides that, except as otherwise provided in subtitle A of the Internal Revenue Code of 1986, gross income includes compensation for services, including fees, commissions, fringe benefits, and similar items."). "Examples of fringe benefits include: an employer-provided automobile, a flight on an employer-provided aircraft, an employer-provided free

---

thus the fact that it has been separately administered does not present a material issue of fact. In footnote 19 to their opposition brief, Plaintiffs state that, in internal documents, AT&T and BellSouth acknowledge that Concession consisted of different plans, citing Ex. DDD-1. However, that document does not state that BellSouth OOR Retiree Concession was a separate benefit plan. It does refer to different products or concessions and the levels of discounts given to "actives" and "retirees," but it indicates that all retirees receive the same benefits. It also notes that there are "4 different retiree concession programs" and "4 retiree plans," but never states BellSouth OOR Retiree Concession was an independent benefit plan or that OOR retirees received a different benefit than in-region plans. There is simply no evidence that Defendants ever conceived of an independent plan to provide a benefit designed solely to reimburse retirees living outside the service area for telephone service supplied by another company. (In fact, such a plan would appear to be absurd). Rather, the evidence is that Defendants conceived of a plan to provide the same benefit to all retirees, but had to utilize different methods for providing the benefit to retirees if and when they moved out of region as a result of the physical limitations in Defendants' service area. Plaintiff's evidence therefore fails to raise a material issue of fact with regard to whether BellSouth's OOR Retiree Concession was a separate benefit plan as opposed to simply a separately administered portion of the same benefit plan.

Plaintiffs also cite Ex. EEE, the deposition of Christine Mataya, AT&T's Lead Benefits Consultant for Human Resources and HR Policy, and Ex. EEE-1. In Ex. EEE-1, Mataya stated that she had identified "over 20 plus plans" among the various four legacy companies acquired by AT&T. In her deposition testimony discussing Ex. EEE-1, Mataya clarified that "we said plans, but really it would be more of guidelines within each of the structures of the plans, how they would be administered. So I think the depiction of plans here was not accurate." Ex. EEE at 130. Mataya further noted that the "plans or criteria" were broken down to "highlight all the different nuances that it takes to administer all of these different populations, employees, wherever they reside." Ex. EEE at 132. Again, this evidence does not show that the BellSouth OOR Retiree Concession was a separate benefit plan.

or discounted commercial airline flight, an employer-provided vacation, an employer-provided discount on property or services, an employer-provided membership in a country club[18] or other social club, and an employer-provided ticket to an entertainment or sporting event." *Id.* "Examples of excludable fringe benefits include qualified tuition reductions provided to an employee (section 117(d)); meals or lodging furnished to an employee for the convenience of the employer (section 119); benefits provided under a dependent care assistance program (section 129); and no-additional-cost services, qualified employee discounts, working condition fringes, and de minimis fringes (section 132)."

26 U.S.C. § 132(a) specifically excludes "certain fringe benefits" from gross income, including any fringe benefit that qualifies as a (1) no-additional-cost service, (2) qualified employee discount,[19] (3) working condition fringe, (4) de minimis fringe,[20] (5) qualified transportation fringe, (6) qualified moving expense reimbursement, (7) qualified retirement planning services, or (8) qualified military base realignment and closure fringe.[21] Subsection 132(b) provides that, "[f]or purposes of this section, the term 'no-additional-cost service' means any service provided by an employer to an employee for use by such employee if–(1) such service is offered for sale to customers in the ordinary course of the

---

[18] Defendants note, and the Court is aware, that the Eleventh Circuit in *Williams v. Wright*, 927 F.2d 1540, 1549 n.17 (11th Cir. 1991) stated that "Williams concedes that some benefits described in the 1981 letter, the country club dues and the use of a vehicle, are not among those types of benefits covered by ERISA." The Court cited the definitions for welfare and pension plans in summarily stating that "[u]nlike the monetary payments and the insurance benefits, the country club and vehicle use benefits are not covered by ERISA." *Id.* at 1550. However, the Eleventh Circuit provided no analysis for its conclusion that these fringe benefits would not be governed by ERISA. The Court is not aware of any case holding that fringe benefits are categorically excluded from ERISA coverage.

[19] "Qualified employee discount" means "any employee discount with respect to qualified property or services to the extent such discount does not exceed – (A) in the case of property, the gross profit percentage of the price at which the property is being offered by the employer to customers, or (B) in the case of services, 20 percent of the price at which the services are being offered by the employer to customers." 26 U.S.C. § 132(c).

[20] "De minimis fringe" means "any property or service the value of which is (after taking into account the frequency with which similar fringes are provided by the employer to the employer's employees) so small as to make accounting for it unreasonable or administratively impracticable." 26 U.S.C. § 132(e).

[21] 26 U.S.C. § 132(j) also includes additional "special rules," including that "gross income shall not include the value of any on-premises athletic facility provided by an employer to his employees."

line of business of the employer in which the employee is performing services, and (2) the employer incurs no substantial additional cost (including forgone revenue) in providing such service to the employee (determined without regard to any amount paid by the employee for such service)." Further, retired employees are "treated as employees for purposes of subsections (a)(1) [no-additional cost services] and (2) [qualified employee discounts]." 26 U.S.C. § 132(h)(1)(A) ("For purposes of paragraphs (1) and (2) of subsection (a) . . . With respect to a line of business of an employer, the term "employee" includes-- (A) any individual who was formerly employed by such employer in such line of business and who separated from service with such employer in such line of business by reason of retirement or disability . . ."). Thus, no-additional cost services provided to retirees are excluded from gross income. The *Schwegmann* court expressly noted that a no-additional-cost-service benefit is not income for purposes of ERISA. *Id.* at 347 ("Had the courts looked to the IRC to determine whether the travel benefits were income, they would have answered this question [whether certain travel benefits provided income to retirees] in the negative because those benefits provided a 'no-additional-cost-service.").

Treasury Regulation § 1.132-2 provides that "[g]ross income does not include the value of a no-additional-cost service" and provides that a "no-additional-cost service" is "any service provided by an employer to an employee for the employee 's personal use if--

(i) The service is offered for sale by the employer to its customers in the ordinary course of the line of business of the employer in which the employee performs substantial services, and

(ii) The employer incurs no substantial additional cost in providing the service to the employee (including foregone revenue and excluding any amount paid by or on behalf of the employee for the service).

26 C.F.R. § 1.132-2.[22] Section 1.132-2 expressly addresses "excess capacity services," and provides

---

[22] Treasury Regulation § 1.132-2 directs readers to § 1.132-4 for rules relating to the line of business limitation. Treasury Regulation § 1.132-4 provides:

A no-additional-cost service . . . provided to an employee is only available with respect to property or services that are offered for sale to customers in the ordinary course of the same line of business in which the employee receiving the property or service performs substantial services. Thus, an employee who does not perform substantial services in a particular line of business of the employer may not exclude from income under section 132 (a)(1) or (a)(2) the

that "[s]ervices that are eligible for treatment as no-additional-cost services include excess capacity services such as hotel accommodations; transportation by aircraft, train, bus, subway, or cruise line; and *telephone services*." *Id.* § 1.132-2(a)(2) (emphasis added). "The exclusion for a no-additional-cost service applies whether the service is provided at no charge or at a reduced price" and "if the benefit is provided through a partial or total cash rebate of an amount paid for the service." *Id.* § 1.132-2(a)(3).

It is undisputed that BellSouth has treated in-region concession as a non-taxable fringe benefit under the no-additional-cost-service exception. Pl. Ex. ZZZ SBC0019839 ("BellSouth is treating its telephone concession as a no additional cost service."); Pl. Ex. J Fetick Depo at 24. Further, Congress expressly considered concession provided to pre-divestiture retirees in the Tax Reform Act of 1986. It provided that, for pre-divestiture retirees, all the entities subject to the modified final judgment[23] (*i.e.*, divestiture) be treated as one employer for purposes of no-additional-cost service

---

value of services or employee discounts received on property or services in that line of business.

26 C.F.R. § 1.132-4(a)(1). "An employer's line of business is determined by reference to the Enterprise Standard Industrial Classification Manual (ESIC Manual) prepared by the Statistical Policy Division of the U.S. Office of Management and Budget. An employer is considered to have more than one line of business if the employer offers for sale to customers property or services in more than one two-digit code classification referred to in the ESIC Manual." *Id.* § 1.132-4(a)(2). However, if an employer "has more than one line of business, such lines of business will be treated as a single line of business where and to the extent that one or more of the following aggregation rules apply: (i) If it is uncommon in the industry of the employer for any of the separate lines of business of the employer to be operated without the others, the separate lines of business are treated as one line of business; (ii) If it is common for a substantial number of employees (other than those employees who work at the headquarters or main office of the employer) to perform substantial services for more than one line of business of the employer, so that determination of which employees perform substantial services for which line or lines of business would be difficult, then the separate lines of business of the employer in which such employees perform substantial services are treated as one line of business. . . . (iii) If the retail operations of an employer that are located on the same premises are in separate lines of business but would be considered to be within one line of business under paragraph (a)(2) of this section if the merchandise offered for sale in such lines of business were offered for sale at a department store, then the operations are treated as one line of business. . . ." This section also includes a "grandfather rule for telephone service provided to predivestiture retirees," discussed *supra*.

[23] This refers to the Modified Final Judgment issued by the district court for the District of Columbia on August 24, 1982 in *United States v. Western Electric*, Civ. A. No. 82-0192 requiring the separation of the Bell System Companies, also known as divestiture. Bell submitted a plan of reorganization, which was approved by the court on August 5, 1983.

tax treatment. 26 C.F.R. § 1.132-4©).[24] Further, it provided that payment, including a rebate of the amount paid by the employee for service, by an entity subject to the modified final judgment of all or part of the cost of local telephone service provided to an employee by a person other than an entity subject to the modified final judgment shall be treated as telephone service provided to the employee by the entity making the payment for purposes of this section. 26 C.F.R. § 1.132-2(a)(6). As a result, pre-divestiture retirees receiving out-of-region reimbursement for local telephone service are exempt from taxation under the no-additional-cost service rules.

Plaintiffs consistently "take no position" with regard to whether in-region form of concession is taxable income. *See* Docket no. 86 at 15 n.18. Plaintiffs' ERISA expert testified that he took no position on whether in-region retiree concession was a pension plan because it was not clear that it provided retirement income. Pl. Ex. UU and Def. Ex. 19 at 86-87. In a footnote in their response to Defendants' Motion for Summary Judgment, Plaintiffs state that "[e]ven for eligible services, the exclusion is not automatic, but subject to certain requirements" and that "[t]here is no evidence whether BellSouth's Concession meets the no-additional cost exception." Docket no. 86 at 9 n.10. However, Plaintiffs, who have the burden of proof on the issue of whether retiree telephone concession provides retirement income, provide no evidence that would indicate that BellSouth did not believe that its in-region form of concession qualified for a no-additional-cost service exclusion or that BellSouth did not consistently treat it as such. Plaintiffs have also provided no evidence that in-region concession does not qualify. Nor have they shown that in-region telephone concession has ever been treated as taxable income by the IRS. *See Rathbun*, 458 F. Supp. 2d at 1244 (noting that Qwest's concession of free services to current and former employees was a no-additional-cost-service fringe benefit excluded from taxable income).

It is also undisputed that BellSouth did not report OOR concession reimbursements for

---

[24] (c) Grandfather rule for telephone service provided to predivestiture retirees. All entities subject to the modified final judgment (as defined in section 559(c)(5) of the Tax Reform Act of 1984) shall be treated as a single employer engaged in the same line of business for purposes of determining whether telephone service provided to certain employees is a no-additional-cost service. The preceding sentence applies only in the case of an employee who by reason of retirement or disability separated before January 1, 1984, from the service of an entity subject to the modified final judgment. This paragraph (c) only applies to services provided to such employees as of January 1, 1984. For a special no-additional-cost service rule relating to such employees and such services, see § 1.132-2(a)(6).

employees and retirees as gross income prior to the merger with AT&T in December 2006. Def. Ex. 15; Pl. Ex. J Fetick Depo. at 54 ("I believe prior to the merger, they [BellSouth] were not taxing the benefit, whatsoever.").[25] After the merger, it began reporting these amounts on W-2 forms in order to be consistent with AT&T's practice. Def. Ex. 15, Fetick Depo. at 54:19-23, Def. Ex. 16, ATTBS0002323, Ex. 17, ATTBS0155655.[26] Defendants' Second Amended Responses and Objections to Plaintiffs' First Set of Interrogatories states, however, that "[w]hile BellSouth presently views telephone concession reimbursements as includable in gross income for tax purposes following the Merger, it does not withhold federal and state income taxes on these reimbursement payments. Each concessioner, as the actual taxpayer, may have claimed a no-additional-cost exclusion and demonstrated nontaxability to the IRS if he or she chose to do so. Defendants do not make income tax decisions or file tax returns for employees or retirees. To Defendants' knowledge, neither the Tax Court nor other court with jurisdiction has determined whether the reimbursements are excludable from gross income for tax purposes." Pl Ex. D at 17. Thus, it was only after the merger that BellSouth began treating any form of concession as potentially taxable income.

**D. Whether the plan was designed to and does provide retirement income?**

Though concession is a benefit provided to retirees, the Court finds that concession was never designed to provide "retirement income" to BellSouth retirees. Defendants' telephone concession plan for retirees provides free and discounted telephone services to both in-region and out-of-region retirees. Documents from the 1950s indicate that Bell, which began the practice of concession, did

_____

[25] Plaintiffs provide evidence that some individuals questioned the practice of not reporting OOR concession as taxable income, see Pl. Ex. LLL DeWard Decl. at ¶ 9 (noting that he strongly suggested that BellSouth begin reporting those payments as taxable income), and that BellSouth was aware at least by 2003 that it should be treating OOR concession as taxable income, see Pl. Ex. WWW.

[26] Since at least 1997, AT&T had three different "tax components" to concession: (1) for predivestiture retirees, concession was excluded from income; (2) for in-service active employees, concession was excluded from income under 26 U.S.C. § 132; and (3) for out-of-service area employees or retirees, if concession was offered by reimbursement, it was treated as taxable income and reported to the IRS on form W-2. Pl. Ex. J Fetick Depo. at 25. Fetick testified that retiree concession was treated as compensation attributable to prior service. Id. at 26. After the merger, "legacy" employees were informed that "[b]ased on IRS guidelines, reimbursement of phone concession for employees who reside outside of the company's local service area is treated as taxable income." Def. Ex. 16 ATTBS0002323. Retirees were also informed that reimbursement for out-of-region concession would be treated as taxable income and would be subject to tax withholding for post-divestiture retirees. Def. Ex. 17 ATTBS0155655.

26

not believe that telephone concession provided taxable income. And since divestiture, BellSouth has never treated any form of in-region concession to be taxable income. To provide an equivalent benefit to employees and retirees unable to receive telephone concession because of the physical limitations of Defendants' service area, Defendants offered out-of-region concession. BellSouth only began reporting out-of-region concession as taxable income after the merger with AT&T.

As of December 29, 2006, BellSouth's total retiree population eligible to participate in concession included 63,239 retirees, of whom 7,610 were residing out of region. Docket no. 79 at 6 (citing Def. Ex. 6); Pl. Ex. D at 6. Of the OOR retiree group, 1,174 were pre-divestiture retirees and their benefit is expressly exempted from the definition of gross income. Pl. Ex. D at 7; *see* 26 C.F.R. 1.132-2(a)(6). As a result, only 6,436 were post-divestiture retirees whose concession benefit could be viewed as gross income. JP Morgan, which performed an actuarial calculation on the telephone concession benefit, concluded that 6.3% of active employees hired before April 1, 1996 would become eligible for reimbursement as OOR retirees once retired. Pl. Ex. S at 7-9. Thus, the undisputed summary-judgment evidence indicates that, when viewed with regard to all retirees, the plan is not designed to and does not provide retirement income, but rather was designed to and does provide a non-taxable fringe benefit. The fact that a small portion of the retirees receive a taxable benefit does not render that portion of the plan an ERISA pension plan.[27]

The Court is mindful of Plaintiffs' position that ERISA expressly provides that a plan may

---

[27] Defendants also argue that the in-region form of concession is expressly exempted from ERISA under § 2510.3-1(e) as an employee sale. The Fifth Circuit held in *Schwegmann* that the grocery vouchers were not exempt from ERISA as employee sales under 29 C.F.R. § 2510.3-1(e) because providing free groceries is not a sale. Thus, it may be that *Schwegmann* precludes such a finding for the 100% discount on local telephone service (though it may not for the intra-LATA/usage discounts). However, the Court finds that the existence of this provision further supports the conclusion that an employer's provision of no-additional-cost in-kind services are not pension plans because they do not provide retirement income. Though § 2510.3-1(e) expressly excludes only "a sale of articles or commodities of the kind which the employer offers for sale in the regular course of business," whether or not at prevailing market prices, that section also states that some of the practices listed in § 2510.3-1 are not borderline cases and "should not be read as implicitly indicating the Department's views on the possible scope of section 3(1)." Thus, the fact that the benefit in question here does not precisely fit the requirements of § 2510.3-1(e) so as to be exempt does not require the converse finding that it is a pension plan under ERISA. Defendants have provided a DOL opinion letter from 1999, in which the DOL concluded, after citing § 2510.3-1(e), that "[a]n airline's free or reduced cost 'in-kind' travel pass program for former employees, however, has not been identified by the Department as among the types of welfare or pension benefits covered by Title I or ERISA." 1999 ERISA LEXIS 11 (March 26, 1999).

be a pension plan "to the extent that" it provides retirement income. However, as the Court noted in *Murphy*, to provide retirement income, the plan must be designed to provide retirement income. As discussed above, in making this determination, the Court concludes that it is appropriate to consider the benefit provided to all retirees under the plan rather than a small portion of retirees under the plan. If the plan here were intended to provide different types of benefits to different classes of retirees, then it might be appropriate to view OOR Retirees in isolation. However, because the Court has found that the undisputed evidence shows that the plan was intended to provide the same benefit to all retirees, the Court does not find it appropriate to dissect a single benefit into two discrete sub-categories and treat one as an ERISA pension plan and one as not simply because they are separately administered. Viewed in that light, Defendants' plan to provide telephone concession benefits to retirees was not designed to provide retirement income, despite the fact that it may provide taxable income to a small portion of retirees.

This case is distinguishable from *Schwegmann*, in which it was clear and undisputed that SGSM intended the vouchers to provide retirement income. SGSM issued four vouchers for a fixed total amount ($216) each month, deducted the total face value of the vouchers as a business expense on its tax returns under the category of "retirement plans," and issued an IRS form 1099-R to every retiree receiving vouchers reflecting the face value of the vouchers received by the retiree that year.[28] The Fifth Circuit expressly noted that "SGSM considered the vouchers as income under the IRC." *Schwegmann*, 332 F.3d at 345. In this case, the evidence is to the contrary – that BellSouth did not consider concession to be taxable income under the IRC.

## E. Whether the telephone concession plan results in a deferral of income?

Defendants move for summary judgment on the issue of whether telephone concession is a pension plan because it defers income. ERISA provides that a pension plan is one that, by its express terms or as a result of surrounding circumstances "results in a deferral of income by employees for

---

[28] Neither BellSouth nor AT&T has ever taken a tax deduction for retirement plans based on OOR expenditures, nor have they reported such payments on form 1099-R. Def. Reply Docket no. 88 at 7. Further, in *Schwegmann*, the vouchers were issued automatically and treated as taxable income for their face value, regardless of whether they were used by the retiree. Here, in contrast, reimbursements were issued only after the employee incurred the charges and submitted their bill for reimbursement. If the employee did not utilize the services, no benefit was given. And, significantly, if two or more retirees resided at a single address, only one benefit was available.

periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2). Defendants point out that retirees have no entitlement to any amounts until they incur eligible expenses, and that the courts in both *Stoffels* and *Rathbun* concluded that concession reimbursements are not a deferral of income. *Stoffels*, 555 F. Supp. 2d at 764; *Rathbun*, 458 F. Supp. 2d 1248.[29]

Plaintiffs contend that any arrangement providing for some type of deferred compensation will also establish a *de facto* pension plan even when the benefits are subject to certain conditions. *Modzelwski v. Resolution Trust Co.*, 14 F.3d 1374, 1376 (9th Cir. 1994) ("Because ERISA's definition of a pension plan is so broad, virtually any contract that provides for some type of deferred compensation will also establish a de facto pension plan, whether or not the parties intended to do so."). They note that, in *Stoffels*, a letter sent to pensioners that indicated that "[t]he retiree telephone concession is deferred compensation" was sufficient to create a genuine issue of material fact precluding summary judgment. *Stoffels*, 526 F. Supp. 2d at 652. However, after a trial before an advisory jury, Judge Justice concluded that retiree concession did not result in a deferral of income. Judge Justice held that, "[l]ike the plaintiffs in *Musmeci* [*v. Schwegmann*], Plaintiffs have failed to adduce sufficient evidence that Plaintiffs deferred compensation and that Concession provided this compensation. Plaintiffs have failed to show that their wages would have been higher if Concession had been eliminated." *Stoffels*, 526 F. Supp. 2d at 765.

Plaintiffs argue that there is more than sufficient evidence that Concession was compensation and was perceived as such, that retirees understood that retiree concession was "earned by working" and was compensation for services previously rendered by retirees, and that eliminating Concession would result in higher wages.[30] Plaintiffs contend that, because these payments are earned during employment and paid during retirement, they are deferred income.

---

[29] Plaintiffs note that the court in *Rathbun* found that it was not a pension plan because it did not result in the "systematic deferral until retirement of income earned during employment." *Rathbun*, 458 F. Supp. 2d at 1238. Plaintiffs assert that the court applied the wrong standard, because the requirement that payments be systematically deferred applies only to bonus plans, which concession is not.

[30] Plaintiffs point to documents from proceedings before various Public Service Commissions in the 1970s and 1980s concerning whether telephone operating companies should be able to take concessions into account when setting rates. Defendants point out that, to the extent these documents show that, if concession were eliminated, wages would need to be higher because employees viewed concession as part of their compensation, they do not discuss OOR Retiree concession.

The Court concludes that telephone concession provided to retirees does not result in a deferral of income. Because concession is not regarded as "income" for purposes of the IRC and ERISA, provision of concession in retirement is not a deferral of income.

### Conclusion

For the reasons discussed herein, the Court finds that OOR Retiree Concession cannot be viewed in isolation when determining whether the plan provides retirement income or results in the deferral of income. Considering the plan to provide telephone concession in retirement as it applies to all retirees, the Court finds that the evidence demonstrates that the plan was neither designed to nor does provide income to the vast majority of retirees under the plan, but rather provides a non-taxable fringe benefit. Plaintiffs have failed to raise a material issue of fact on the issue of whether the plan as applied to all retirees provides retirement income or results in a deferral of income. Accordingly, the Court will grant summary judgment for Defendants on the basis that the telephone concession plan is not an ERISA pension plan.

Plaintiffs' Motion for Partial Summary Judgment (docket no. 81) is DENIED.

Defendants' Motion for Summary Judgment (docket no. 79) is GRANTED.

This is a final order of summary judgment in favor of Defendants that resolves all pending issues and claims. Accordingly, the Clerk is directed to enter judgment in accordance with Rule 58.

It is so ORDERED.

SIGNED this 18th day of March, 2010.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE